**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EVELYN CARTAGENA,**

                  **Plaintiff,**

      **vs.**

**COMMISSIONER OF SOCIAL SECURITY,**

                **Defendant.**
_____

                             **1:04-CV-1081**
                             **(NAM/DEP)**

**APPEARANCES:**                           **OF COUNSEL:**

Legal Aid Society                        Peter Racette, Esq.
Plattsburgh Office
100 Court Street
P.O. Box 989
Plattsburgh, NY 12901
and
Legal Aid Society                        Michael J. Foster, Esq.
Albany Office
55 Colvin Avenue
Albany, NY 12206
*Attorneys for Plaintiff*

Glenn T. Suddaby                     William H. Pease
United States Attorney for the        Assistant United States Attorney
Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel           Barbara L. Spivak
Social Security Administration       Chief Counsel, Region II
16 Federal Plaza
New York, New York 10278        Sheena V. Barr
*Attorneys for Defendant*           Assistant Regional Counsel

**Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Evelyn Cartagena brings the above-captioned action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for disability insurance benefits ("DIB").  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  The Court referred this matter to United States Magistrate Judge David E. Peebles, who reported that the Commissioner's decision was supported by substantial evidence, and recommended that the Court grant defendant Commissioner of Social Security's motion for judgment on the pleadings, affirm the Commissioner's determination of disability, and dismiss the claimant's complaint in its entirety.  Presently before the Court are plaintiff's objections to the Report and Recommendation.

## II.    BACKGROUND

Neither party objects to Magistrate Judge Peebles's recitation of the background in this case.  Therefore, the Court adopts the portion of the Report and Recommendation entitled "Background" in its entirety, and will provide a brief summary of the relevant facts.

The claimant, Evelyn Cartagena, was born in Buffalo, New York on September 14, 1959.  (T. 285).  Plaintiff spent the majority of her childhood living in Puerto Rico, but returned to New York State in 1983 or 1984.  (T. 60, 77).  Her primary language is Spanish; plaintiff does not speak fluent English, nor is she able to read or write English to any significant degree.  (T. 59-60, 64).

Before returning to the United States, plaintiff was employed as a secretary in Puerto Rico.  (T. 60).  Her most recent employment was at a coat factory in Buffalo, New York, where

2

she worked as a sewing machine operator.  (*Id*.).  Plaintiff left this position in 1986 to care for her family, and has not been employed since that time.  (*Id*.).

According to her medical records and testimony, plaintiff's physical and psychological difficulties began in 1995 when she was injured in a motor vehicle accident.  (T. 64).  As a result of the injuries she sustained during the accident, plaintiff experiences physical symptoms, including pain and weakness in her right side, and headaches that occur three to four times per week.  (T. 63-64, 79, 81).  The claimant also suffers from psychological symptoms and has been variously diagnosed with depression, post traumatic stress disorder, and anxiety disorder.  (T. 63-65, 285, 291).  Plaintiff's mental condition is the focus of the present action.

## III.    MEDICAL EVIDENCE

### A.    Treating Sources

#### 1.    Lily Kam, M.D.

Plaintiff was injured in a motor vehicle accident on September 7, 1995, and was treated at Schenectady Family Health Services for neck and back pain. (T. 245).  Plaintiff received physical therapy in 1995 and 1996 and chiropractic care in 1997.  (T. 221; 228-35; 302; 364; 465-68).  On August 21, 1996, plaintiff began receiving treatment from Dr. Lily Kam at Schenectady Family Health Services.  (T. 302, 326).  Dr. Kam concluded that plaintiff suffered a whiplash injury in the accident and recommended that she continue physical therapy and chiropractic care. (T. 326).  Dr. Kam also indicated that plaintiff might be suffering from Post Traumatic Stress Disorder and referred her for mental health counseling. (T. 326).  Plaintiff continued treatment with Dr. Kam for chronic neck, back and hip pain, headaches and depression. (T. 302-25;449-56).

3

On August 26, 1997, Dr. Kam assessed plaintiff's condition and completed a "questionnaire as to residual functional capacity psychiatric impairment". (T. 291-300). In a letter attached to the questionnaire, Dr. Kam stated she had been treating plaintiff monthly since August 21, 1996, for chronic headache syndrome, degenerative disc disease, fibromyalgia, and post traumatic stress disorder. (T. 291). Dr. Kam stated that plaintiff "frequently feels lack of energy, feelings of worthlessness, has difficulty concentrating, suffers from insomnia and occasionally has suicidal ideations." *Id*. Dr. Kam indicated that she was treating plaintiff with Paxil and Fiorecet and that the Paxil "seems to be helping to a certain degree." *Id*.

According to Dr. Kam, plaintiff's symptoms included anxiety attacks, feelings of hopelessness and helplessness, frustration, lack of concentration, memory deficits, irritability, nervousness and tremors. (T. 292). Dr. Kam described plaintiff's mental status as "normal appearance speech is clear thought content & organization obsessed on symptoms mood is depressed affect constricted, [] sensorium + intellect insight and judgment slightly impaired". *Id*. Dr. Kam indicated that plaintiff had persistent depression, agitation, psychomotor disturbance, "structural changes mediated through psychophysiological channels", "interference with concentration and memory", and "depressive affect with insomnia, loss of weight, and/or suicidal preoccupation". (T. 293-94). Dr. Kam stated that plaintiff had tried several medications, including Zoloft, Prozac, Buspar, and Trazodone, was currently taking Paxil and Fiorcet for her headaches, and was "showing some improvement". (T. 295). Dr. Kam opined that plaintiff's degree of impairment in the following activities were moderately severe: perform daily activities; constriction of interests; understand, remember and carry out instructions; perform complex tasks; perform repetitive tasks; perform varied tasks; deal with changes in the work place; respond to

4

supervision; respond appropriately to customary work pressures; and meet production, quality and attendance standards.  (T. 297-98).  Dr. Kam stated that plaintiff's degree of impairment in the following activities were moderate: relate to other people; perform work requiring frequent contact with others; perform work with minimal contact with others; perform simple tasks; and respond appropriately to co-workers. (T. 297-98).  Dr. Kam concluded that work on a regular and competitive basis, even if low stress and sedentary, would likely cause decompensation or otherwise negatively affect plaintiff's psychiatric condition. (T. 299).

On July 10, 1998, Dr. Kam updated plaintiff's condition. (T. 302).  Dr. Kam stated that in addition to Paxil and Fiorcet, plaintiff recently started taking Ambien because of her difficulty sleeping.  *Id*.  Dr. Kam stated that plaintiff's levels of depression and anxiety varied "but seem to be better controlled with Paxil."  *Id*.  According to Dr. Kam, recently plaintiff "has experienced increased stressors in her life" and as a result, plaintiff's symptoms had worsened and she was having problems sleeping and more frequent anxiety attacks. *Id*.  Dr. Kam reported that plaintiff had been referred to Sunnyview Pain Clinic for her physical pain, but had been unable to participate due to anxiety.  *Id*.  Dr. Kam concluded that although plaintiff  had periods of improvement, her symptoms were not resolving and substantially limited her ability to work. *Id*.

On February 14, 2001, Dr. Kam wrote a brief statement that plaintiff was under her care for Post Traumatic Stress Disorder with resultant anxiety disorder and depression and that she was severely disabled by this condition and required ongoing psychiatric therapy that she could not afford. (T. 487).  Dr. Kam stated that plaintiff also suffered from degenerative disc disease,

chronic tension headaches and fibromyalgia. *Id.* Dr. Kam concluded that plaintiff was incapable of working at the present time or in the near future. *Id.*

### 2.   Reinaldo Cardona, Clinical Social Worker

Plaintiff began treatment with Reinaldo Cardona, CSW, on January 16, 1997 for a "mental disorder". (T. 287).  In a report dated April 10, 1997, Cardona stated that he saw plaintiff approximately once a week and that she reported being extremely anxious since the motor vehicle accident in 1995. *Id.*  According to Cardona, during the course of treatment, plaintiff displayed difficulty sleeping and concentrating; irritability and anger outbursts for no apparent reason; hypervigilance and exaggerated startle response; and an obsession with recurrent distressing thoughts of the accident. *Id.*  Cardona reported plaintiff's mood as anxious and that he often observed tremors; a constricted affect; short term memory loss and poor concentration. *Id.* Cardona stated that plaintiff was oriented to time, place and person with moderately impaired insight and judgement, with no auditory or visual hallucinations or homicidal or suicidal ideation. *Id.* Cardona reported that plaintiff attempted to engage in activities of daily living, but had great difficulty, her household duties were quite limited and she had no interests or hobbies other than attending church. (T. 287-88).  Cardona concluded that plaintiff was not able to work due to pain, difficulty concentrating, forgetfulness, and chronic headaches. (T. 288).

On October 18, 1997, Cardona summarized plaintiff's condition. (T. 285-86). Cardona stated that he had diagnosed plaintiff with Post Traumatic Stress Disorder and Anxiety Disorder and related both conditions to the automobile accident two years earlier. (T. 285). Cardona also indicated that the back and shoulder pain caused by the accident contributed to the anxiety due to concerns about caring for her family and not being able to work. *Id.*  Cardona

stated that plaintiff frequently cried, experienced tremors, had difficulty sleeping, was frightened by shadows and noises, and was fatigued much of the day. (285-86). Cardona indicated plaintiff's fatigue would preclude her from working and stated that she would need to stop and rest while trying to do routine household chores. (T. 286). Cardona stated that plaintiff suffered from decreased libido and had difficulty concentrating and was forgetful. *Id*. Cardona felt that these symptoms markedly restricted plaintiff's daily activities and the pace at which she completed tasks. (T. 286).

On June 25, 1998, Cardona reported that plaintiff continued to experience depressed mood, decreased energy, hopelessness, anxiousness, nausea, irritability, dizziness, and crying spells. (T. 283). Cardona indicated that plaintiff's thinking was clear and her judgment good; that her appearance was good and her attitude cooperative, but that motor activity was often agitated and she had frequent tremors. (T. 283-84). Cardona concluded that plaintiff's progress was cyclical and opined that her it would be very difficult for her to work even part-time due to her inability to concentrate on tasks. (T. 284).

On June 4, 2000, Cardona reported on plaintiff's condition and treatment. (T. 430-31). Cardona stated that he was seeing plaintiff twice a month and employed "cognitive behavioral, problem solving and relaxation therapy." (T. 430). Cardona stated that plaintiff's symptoms included difficulty sleeping and concentrating; irritability and anger outbursts for no apparent reason; hypervigilance and exaggerated startle response; and obsession with recurrent thoughts of the accident in 1995. *Id*. Cardona stated that Cartagena's tremors and crying spells, which had subsided, had re-intensified and were again occurring. *Id*. Cardona reported that plaintiff had difficulty sleeping and was frightened by noises and shadows at night and was

fatigued during much of the day. (T. 431).   Cardona indicated that plaintiff suffered from decreased energy, feelings of guilt, worthlessness, had difficulty concentrating and had memory problems.  *Id*.

According to Cardona, on mental status examination, plaintiff presented a neat and clean appearance; had an anxious mood with frequent tremors; had a constricted affect, short term memory loss, and poor concentration.  *Id*.  Cardona stated that plaintiff had great difficulty with activities of daily living, such as household chores and shopping, and had no interests or hobbies other than church attendance.  *Id*.

On July 8, 2000, Cardona completed a Mental Disorder Questionnaire. (T. 460-64). Cardona stated that in the past year, plaintiff had exhibited disorientation to time and place; disturbance in mood; sleep disturbance; decreased energy; difficulty concentrating or thinking; persistent disturbance of mood or affect; memory impairment; emotional ability; feelings of guilt or worthlessness; easy distractibility; generalized persistent anxiety; and blunt, flat inappropriate affect. (T. 461).  Cardona reported that he provided cognitive, behavioral and behavior modification therapy and that plaintiff was cooperative with treatment and had made cognitive improvements over the past two years. (T. 462).  Cardona added that the improvements included reduction of anxiety and some lifting of depression, but noted that these improvements were cyclical. (T. 463).

In his report, Cardona stated that plaintiff did not have the ability to perform the following basic mental work activities: remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular

8

attendance; be punctual within customary tolerances; work in coordination with or proximity to others; complete a normal workday or workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number of rest periods; accept instructions from and respond appropriately to criticism from supervisors; travel in unfamiliar places or use public transportation; or set realistic goals or make plans independently of others.  (T. 463-64).  Cardona stated that plaintiff was capable of understanding, remembering and carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; making simple, work-related decisions; interacting appropriately with the general public and co-workers; asking simple questions; maintaining socially appropriate behavior; responding appropriately to changes in the work setting; and be aware of normal hazards. (T. 463-64). Cardona estimated that plaintiff's symptoms or treatment would cause her to be absent from work more than three times per month and opined that her prognosis was poor. (T. 464).

**B.      Consulting Sources**

**1.      John Seltenreich, Ph.D.**

On January 22, 1997, Dr. John Seltenreich issued a psychiatric evaluation after examining plaintiff.  (T. 258-60).  Plaintiff reported to Dr. Seltenreich that she had been depressed since the accident "with anhedonia" and experienced, sleep difficulty, low energy, difficulty concentrating, and feelings of worthlessness, but no suicidal ideation. (T. 259).  Dr. Seltenreich stated that Ms. Cartagena's mood was hypophoric and her affect narrow and consistent to her mood.  *Id*.  Dr. Seltenreich indicated that plaintiff's speech was clear, coherent, and goal directed and normal in rate and volume. *Id*.  Dr. Seltenreich found there was no loosening of associations, delusions,

9

hallucinations, paranoias, compulsions, or panic attacks and plaintiff denied suicide or homicide ideations. *Id*.  According to Dr. Seltenreich, sensorium was clear and plaintiff was oriented in all three spheres.  *Id*.  Dr. Seltenreich stated that plaintiff showed reasonable attention and concentration, but could recall only one out of three objects on a delayed recall task.  *Id*.  Dr. Seltenreich indicated that plaintiff's fund of information appeared fair, intelligence appeared average, insight and judgement were fair, and motivation deemed to be good.  *Id*.  Dr. Seltenreich diagnosed plaintiff with major depression and chronic pain and assigned a Global Assessment of Functioning (GAF) score of 55.[1]  (T. 260).  Dr. Seltenreich stated that plaintiff "did not appear to be incapacitated by her mood disturbance," but it did complicate her experience of pain.  *Id*.

### 2.    Michelle Marks, M.D.

On February 14, 1997, Michelle Marks, M.D., a consulting physician, completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique regarding plaintiff. (T. 261-64; T. 273-81).  Dr. Marks concluded that plaintiff had major depression secondary to pain and found plaintiff moderately limited in her ability to maintain attention and concentration for extended periods of time and often had deficiencies of concentration, persistence or pace resulting in failure to complete task in a timely manner. (T. 263; 261; 280).  These conclusions were reviewed and affirmed by another non-examining physician, Dr. Abdul Hameed, on April 21, 1997.  (T. 263; 274).

### 3.    Dr. Annette Payne

---

[1] The Global Assessment of Functioning (GAF) Scale (DSM-IV Axis Victor) ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (American Psychiatric Ass'n 1994) ("DSM") at 32.

On June 6, 2000, Dr. Annette Payne, a consultative examiner retained by the Social Security Administration, conducted psychiatric and organicity evaluations. (T. 433-40). Dr. Payne stated that plaintiff reported dysphoric moods, psychomotor retardation, crying, guilt, hopelessness, loss of usual interests, irritability, fatigue, worthlessness, diminished self-esteem, cognitive interference, and a diminished sense of pleasure. (T. 433, 437).  According to Dr. Payne, plaintiff denied suicide or homicide ideation, but described excessive apprehension and worry, restlessness, difficulty concentrating, and muscle tension.  (T. 434, 438).

Dr. Payne found on mental status examination that plaintiff's appearance, personal hygiene and grooming were good and she maintained adequate eye contact; her speech appeared normal based on what she said to the interpreter; her thoughts were coherent and goal directed based on what she said to the interpreter; there was no evidence of hallucinations, delusions or paranoia; she had a slightly depressed mood and mildly impaired attention and concentration; mostly intact memory; and, no impairment of cognitive function. (T. 434-35). On the Test of Nonverbal Intelligence plaintiff scored an IQ of 82, placing her in the 12th percentile.  (T. 438). Dr. Payne felt plaintiff would have slight difficulties with reading, writing and arithmetic.  *Id*. Dr. Payne stated that on the Bender Visual-Motor Gestalt test, plaintiff showed distortions of overlapping, closure, collision and motor coordination, indicative of significant organic deficits in perceptual-motor integrative functioning. (T. 439). Dr. Payne felt this was indicative of mild neuropsychological damage.  *Id*.

Dr. Payne concluded that plaintiff had "Adjustment Disorder with Depressed Mood" and could follow and understand simple directions and instructions; could perform simple rote tasks under supervision; could consistently perform simple tasks and learn new tasks; could make

appropriate job decisions; could perform complex tasks independently; would have some

difficulty maintaining attention and concentration and relating adequately with others; and would

have difficulty dealing with the normal stressors of a competitive workplace.  (T. 435, 439).

### 4.   Dr. S. Alpert

On July 14, 2000 and September 28, 2000, Dr. S. Alpert, a non-examining review

physician at the New York State Office of Temporary and Disability Assistance, completed forms

indicating that Ms. Cartagena did not have a severe mental impairment.  (T. 457-58; 477-85;

488).

## III.   PROCEDURAL HISTORY

On November 26, 1996, plaintiff filed an application for Supplemental Security Income

("SSI") benefits pursuant to Title XVI of the Social Security Act.  *See* 42 U.S.C. § 1381 et seq.

(Title XVI).  (T. 150-154).  She alleged disability since September 7, 1995, the day of her motor

vehicle accident, due to musculoskeletal and psychological impairments.  *Id.*  The Commissioner

denied plaintiff's application for SSI initially and upon reconsideration.  (T. 101, 107).

Plaintiff requested a review of her application for disability benefits.  A hearing was held

before Administrative Law Judge ("ALJ") Carl E. Stephan on June 26, 1998.  (T. 111, 126).  The

ALJ issued an unfavorable decision, dated September 11, 1998, finding that plaintiff was not

disabled at the relevant times and upholding the denial of benefits.  (T. 42-48).

The Social Security Administration Appeals Council vacated the ALJ's decision on

October 27, 2000, and remanded the matter to the ALJ for further investigation.  (T. 138-139).  In

particular, the Appeals Council directed the ALJ to give consideration to plaintiff's residual

functional capacity compared with the demands of her past relevant work and, in support of any

assessed limitations, "provide appropriate rationale with specific references to evidence of record . . . ." *Id*.  The Appeals Council also directed the ALJ to consider the claimant's second application for SSI benefits, which plaintiff filed on May 16, 2000.  (T. 139).

The ALJ held a second hearing on March 13, 2001, and heard testimony from vocational expert Esperanza Di Stefano.  (T. 71-98).  Plaintiff also attended the hearing, and testified before the ALJ with the assistance of a Spanish interpreter.  *Id*.  The ALJ issued a second opinion, dated April 25, 2001, again concluding that the claimant was not disabled during the relevant time period, and was therefore ineligible for receipt of SSI benefits.  (T. 29-37).

On May 29, 2001, plaintiff requested that the Appeals Council review the ALJ's April 25, 2001 decision.  (T. 23-25).  Plaintiff submitted additional evidence for the Council to consider.  (T. 10, 21).  The Appeals Council refused plaintiff's request for review on May 12, 2004, stating that her arguments and additional evidence did not provide a basis for alteration of the ALJ's decision.  (T. 7-9).  The Appeals Council accordingly declared that the ALJ's determination was the final decision of the Commissioner of Social Security.  (T. 7).  Plaintiff commenced this action on September 16, 2004, seeking judicial review of the Commissioner's denial of her application for disability benefits**.**

## IV.    THE ALJ'S DECISION

The Social Security Act (the "Act") authorizes payment of Supplemental Security Income to individuals with "disabilities."  42 U.S.C. § 1381 *et seq*.  Title XVI of the Act defines a "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 1382c(a)(3)(A).  A person qualifies as disabled, and is eligible for benefits "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Social Security regulations specify that an administrative law judge must follow a five-step sequential evaluation process when considering a claim for SSI disability benefits.  20 C.F.R. § 416.920(a)(4); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).  The determination of a claimant's request for benefits should therefore proceed as follows:

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (citations omitted).

In the present case, the ALJ followed the five-step sequential evaluation process pursuant to 20 C.F.R. § 416.920.  Based upon his review of the medical and testimonial evidence, the ALJ determined at step one of the analysis that plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (T. 30).  The ALJ concluded at step two that the claimant suffered

from musculoskeletal and mental impairments that were "severe" within the meaning of the Act.
(T. 32).  At the third step, he found that plaintiff's impairments did not meet or equal any of the
presumptively disabling impairments listed in the governing regulations.  *Id.*, *see* 20 C.F.R. Pt.
404, Subpt. P, Appendix 1.  The ALJ next determined that the claimant retained "the ability to
perform light work requiring only occasional climbing, stooping, bending, crouching and
crawling as well as a mildly limted [sic] ability to tolerate work stresses, concentrate, execute
detailed instructions, relate to co-workers and deal with the public."  (T. 32).  The ALJ further
concluded that, while plaintiff suffered from a variously diagnosed mental condition, she retained
the ability to understand and carry out simple instructions, and to interact and function
appropriately in a workplace.  (T. 33).  The ALJ completed his analysis at step four of the inquiry,
finding that, because plaintiff was capable of performing her past relevant work as a sewing
machine operator, she was not disabled within the meaning of the Act.  (T. 36-37).

## IV.    THE REPORT AND RECOMMENDATION

The Court referred this case to United States Magistrate Judge David E. Peebles for a
report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d).
Magistrate Judge Peebles concluded that: (1) the ALJ's findings regarding plaintiff's mild
limitations in certain areas of functioning relevant to work place activities were supported by
substantial evidence; (2) the ALJ's findings did not result from an improper rejection of the
opinions of plaintiff's treating physician or her therapist; (3) the ALJ's determination of non-
disability was amply supported by testimony from the vocational expert that plaintiff was capable
of performing her past relevant work; and (4) the decision of non-disability was fully consistent
with the administrative record and the evidence of plaintiff's daily activities.  Accordingly, the

magistrate judge recommended that the Court grant the Commissioner's motion for judgment on the pleadings, affirm the Commissioner's determination of non-disability, and dismiss plaintiff's complaint in its entirety.

Presently before the Court are plaintiff's objections to the Report and Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(c), this Court engages in a *de novo* review of any part of a Report-Recommendation to which a party specifically objects.  Failure to object to any portion of a Report and Recommendation operates as a waiver of further judicial review of those matters. *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Secretary of Health & Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989).

Plaintiff's objections, like her arguments before the magistrate judge, exclusively concern her alleged mental health impairment, plaintiff contends: (1) that the Court should reject the conclusion in the Report and Recommendation that the ALJ properly evaluated the opinion of plaintiff's treating physician, Dr. Lily Kam; and (2) that the Court should reject the conclusion in the Report and Recommendation that there is substantial evidence to support the ALJ's finding that, despite her mental impairments, plaintiff has the residual functional capacity to return to past relevant work.

**V.     DISCUSSION**

The Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Shaw*, 221 F.3d at 131.  The Court may also set aside the Commissioner's decision

when it is based upon erroneous legal standards.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir.

1999).  Thus, the Court should not "weigh the credibility of complex, contradictory evidence, or

reconsider anew whether a social security claimant is disabled," but instead, must evaluate the

record "to ensure that an administrative law judge has faithfully fulfilled his legal duties."

*Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004).

### A.    Treating Physician

Plaintiff objects to the magistrate judge's conclusion that the ALJ did not violate the

treating physician rule when he rejected Dr. Kam's opinion that plaintiff suffers limitations as

a result of her mental impairment which preclude work activity.

In this case, the ALJ indicated that he considered Dr. Kam's reports but found that her

"comments" regarding plaintiff's mental status were not controlling:

> In reaching this decision, the Administrative Law Judge has considered the reports
> of Dr. Kam in which she states that the claimant suffers from limitations which
> preclude work activity.  Dr. Kam reports that the claimant's condition will not
> improve until depression lifts.  The Administrative Law Judge notes that Dr. Kam
> is the claimant's treating internist, not psychiatrist.  She has provided the claimant
> with no counseling.  The Administrative Law Judge does not find that the
> comments of Dr. Kam relative to the claimant's psychiatric status are controlling.
> Further, the restrictive limitations imposed by Dr. Kam upon the claimant appear
> unwarranted.  Although the claimant suffers from fibromyalgia, based up on Dr.
> Kam's diagnosis, the claimant has few positive clinical findings.  Diagnostic
> studies have been normal.  The Administrative Law Judge does not find that the
> reports of Dr. Kam are dispositive of the issue of disability and further finds that
> they are not entitled to controlling weight.

(T. 33-34).

The "treating physician rule" generally requires the ALJ to accord controlling weight to

the opinion of a disability claimant's treating physician, 20 C.F.R. § 404.1527(d)(2), unless the

opinion is "not consistent with other substantial evidence in the record, such as the opinions of

17

other medical experts", *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004), or unsupported by medical findings.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Id.*  Additionally, the regulations direct the Commissioner to "give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion."  *Id.*; 20 C.F.R. § 416.927(d)(2).

Here the ALJ found that Dr. Kam's opinions were not entitled to controlling weight. Moreover, as demonstrated by the absence of any discussion of Dr. Kam's response to the "Questionnaire as to Residual Functional Capacity Psychiatric Impairment", the ALJ accorded no weight to Dr. Kam's specific findings that plaintiff's mental impairment caused mild to moderately severe limitations on her ability to work.  (T. 292-300).  The ALJ, however, made no finding that Dr. Kam's opinion regarding plaintiff's mental impairment was inconsistent with the record or unsupported by medical findings.  Thus, the ALJ failed to apply the first step of the treating physician rule.  *See* 20 C.F.R. § 404.1527(d)(2).  Even assuming the ALJ applied the first step, the ALJ failed to consider all the factors outlined in 20 C.F.R. § 404.1527(d)(2) to determine the weight to which Dr. Kam's opinion was entitled.  Indeed, the only reasons the ALJ provided for rejecting Dr. Kam's "comments" "relevant to [plaintiff's] psychiatric status"  were that Dr. Kam was plaintiff's treating internist, not her psychiatrist, and Dr. Kam did not provide plaintiff

18

with any counseling. (T. 33).  Thus, while these reasons may satisfy the ALJ's obligation to

consider whether the opinion is from a specialist, 20 C.F.R. §§ 404.1527(d)(2)(iv),

416.927(d)(2)(iv), and the nature of the treatment relationship, *Id.* §§ 404.1527(d)(2)(I),

416.927(d)(2)(i), there is no indication that the ALJ considered the remaining factors, including

the frequency with which Dr. Kam saw plaintiff, the evidence in support of Dr. Kam's opinion,

and the consistency of Dr. Kam's opinion with the record as a whole.  *Id.* §§ 404.1527(d)(2)(i)-

(iii), 416.927(d)(2)(i)-(iii).[2]  The Second Circuit has stated "[w]e do not hesitate to remand when

the Commissioner has not provided 'good reasons' for the weight given to a treating physicians

opinion and we will continue remanding when we encounter opinions from ALJ's that do not

comprehensively set forth reasons for the weight assigned to a treating physician's opinion."

*Halloran*, 362 F.3d at 33.  Accordingly, this matter is remanded for further proceedings.

### B.        Mental Residual Functional Capacity

Plaintiff objects to the magistrate judge's conclusion that the ALJ had substantial evidence

on which to find that plaintiff's mental health limitations were "mild" and would not prevent her

from returning to past relevant work as a sewing machine operator. (T.36).   According to the

regulations, residual functional capacity is defined as "the most" a claimant "can still do despite

[her limitations." 20 C.F.R. §§ 404.1545(a); 416.945(a).  The ALJ must assess a claimant's

---

[2]In the same paragraph, the ALJ also discounted Dr. Kam's findings regarding the physical limitations plaintiff suffers as a result of her fibromyalgia.  (T. 33-34).  The ALJ discounted these findings because there were few clinical findings and plaintiff's diagnostic studies were normal.  (T. 34).  As previously stated, plaintiff's mental condition is the focus of this action.  Further, even if the ALJ's reasons for discounting Dr. Kam's findings regarding plaintiff's physical limitations are considered together with the ALJ's reasons for discounting Dr. Kam's findings regarding plaintiff's mental limitations, they still do not satisfy the treating physician rule.  Again, there is no indication that the ALJ considered the frequency with which Dr. Kam saw plaintiff, the evidence in support of Dr. Kam's opinion, or the consistency of Dr. Kam's opinion with the record as a whole.  20 C.F.R. §§ 404.1527(d)(2)(i)-(iii), 416.927(d)(2)(i)-(iii).

residual functional capacity "based on all the relevant evidence in [the] case record." *Id*.  The

regulations further provide that:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. §§ 404.1545(c); 416.945(a).

Here, the ALJ found that plaintiff's mental impairment was severe but concluded that, it

would not interfere with her ability to perform past relevant work.  Specifically, the ALJ found

that: "The claimant experiences mild limitations regarding her ability to relate to co-workers, deal

with the public, and interact with supervisors.  Her ability to deal with work stresses, maintain

attention and concentration is mildly limited as is her ability to understand, remember and carry

out detailed instructions."  (T. 36).  Plaintiff argues that these findings, and consequently, the

ALJ's conclusion that she has the mental residual functional capacity to return to past relevant

work as a sewing machine operator, are not supported by substantial evidence.[3]

### 1.       Relate to Co-Workers

As noted, the ALJ found that plaintiff's mental impairment mildly limited her ability to

relate to co-workers.  There is substantial evidence in the record to support this finding. Cardona

opined that although plaintiff could not work " in coordination with or proximity to others

without being distracted by them" (T. 464), she could "get along with coworkers or peers without

---

[3]Plaintiff concedes, however, that there is evidence in support of the ALJ's conclusion that she can "deal with the public".  (T. 463-63)

20

distracting them or exhibiting behavioral extremes". (T. 464). Cardona further stated that plaintiff had the ability "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness". (T. 464). Dr. Payne stated that plaintiff's mental impairment would cause "some difficulties . . . relating adequately with others." (T. 435). Plaintiff takes issue with the degree of limitation the ALJ assigned the plaintiff's ability to relate to co-workers, and argues that it is more than mild. "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). The evidence, however, need only be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). The Court finds that the above-referenced evidence that plaintiff can get along with co-workers, though she may not be able to work in coordination with them, and that she would have "some difficulties" relating to others, adequately supports the ALJ's conclusion that plaintiff's mental impairment mildly limits her ability to relate to co-workers.

### 2. Interact with Supervisors

Plaintiff contends that the ALJ's conclusion that plaintiff's mental impairment mildly limited her ability to interact with supervisors is not supported by substantial evidence. Cardona opined that plaintiff could not accept instructions or respond appropriately to criticism from supervisors, but stated that plaintiff could "ask simple questions or request assistance". T. 463-64. Dr. Payne stated that plaintiff would have "some difficulties" "relating adequately with others." T. 435, 439. In light of this evidence, the Court finds that the ALJ's conclusion that

plaintiff's limitation causes a mild limitation on her ability to interact with supervisors is supported by substantial evidence.

### 3.   Ability to Deal with Work Stresses

Plaintiff argues that her ability to deal with work stress is more than mildly impaired. Here, Dr. Payne opined that plaintiff would "have some difficulties dealing with the normal stresses of a competitive workplace". (T. 435, 439). Although Cardona did not offer an opinion on this specific area, he did state that plaintiff had the ability to "respond appropriately to changes in the work setting" and to "be aware of normal hazards and take appropriate precautions" (T. 463), but that she could not "complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods". (T. 463). This evidence, while indicative of some difficulty dealing with work stress, is adequate to support the ALJ's conclusion that plaintiff's limitation in this area is mild.

### 4.   Attention and Concentration

Plaintiff objects to the ALJ's finding that her mental impairment only mildly limited her ability to maintain attention and concentration. In this case, Cardona opined that plaintiff did not have the ability to maintain attention and concentration for "extended periods" but that she "could sustain an ordinary routine". T. 463. Dr. Payne indicated that plaintiff "would have some difficulties maintaining attention and concentration". T. 435, 439. These opinions are sufficient to support the ALJ's conclusion that plaintiff's mental impairment mildly limited her ability to maintain attention and concentration.

### 5.   Understand, Remember and Carry Out Instructions

22

Plaintiff argues that the evidence does not support the ALJ's conclusion that her mental impairment causes a mild limitation on her ability to understand, remember, and carry out detailed instructions.  The Court agrees.  Given Dr. Payne's opinion that plaintiff could, at most, "follow and understand simple directions and instructions", (T.435, 439) and Cardona's opinion that plaintiff could not carry out detailed instructions (T. 463), the Court finds that the ALJ's conclusion that plaintiff's ability to understand, remember, and carry out *detailed* instructions was mildly impaired is not supported by substantial evidence.  Indeed, there is no evidence that plaintiff has any ability to do more than understand, remember, and carry out simple instructions.  Accordingly, it follows that the hypothetical the ALJ presented to the vocational expert during the hearing (T. 95), which included an assumption that plaintiff's ability to understand, remember, and carry out detailed instructions was mildly limited, is not supported by substantial evidence and, consequently, cannot sustain the Commissioner's conclusion that plaintiff has the residual functional capacity to return to past work as a sewing machine operator.  (T. 36).

### C.      Vocational Expert

In this case, the ALJ asked the vocational expert whether an individual who could, *inter alia*, "understand, remember, and carry out simple instructions," but had "mild limitations in [her] ability to carry out, understand, and remember detailed instructions" could perform work as a sewing machine operator.  (T. 95).  The vocational expert responded "Yes."  *Id*.  The ALJ specifically relied on the vocational expert's testimony in concluding that plaintiff had the residual functional capacity to return to her past relevant work and therefore was not disabled. (T. 36).

The Commissioner may rely on the testimony of a vocational expert as long as "there is substantial record evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).   As discussed, the record does not support the assumption that plaintiff's ability to understand, remember, and carry out *detailed* instructions was mildly impaired.  Indeed, there is no evidence that plaintiff has any ability to carry out, understand, and remember more than simple instructions. Thus, the ALJ's conclusion that plaintiff could return to past relevant work as a sewing machine operator is not supported by substantial evidence.  Accordingly, this matter is remanded for further proceedings.

## VII.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Report and Recommendation is **Rejected**; and it is further

**ORDERED** that the Commissioner's determination is **Reversed**; and it is further

**ORDERED** that this action is **Remanded** to the Commissioner for further proceedings consistent with the opinion herein; and it is further

**ORDERED** that the Clerk of the Court is directed to **Close** this case.

**IT IS SO ORDERED.**

Date:  March 27, 2008

Norman A. Mordue
Chief United States District Court Judge